## Chicago, Lake Shore & Eastern Railway Company v. George Cukravony.

### Gen. No. 4,762.

1. FELLOW-SERVANTS—*who are not.* *Held*, from the facts of this case, that it was proper to submit to the jury the question whether or not the relation of fellow-servants existed between one whose duty it was to shovel ashes upon railroad tracks and another whose occupation required him to move cars upon such tracks.

2. ASSUMED RISK—*how question of, determined.* The question of assumed risk is ordinarily one of fact to be determined by the jury under proper instructions as to the law from the court.

3. VERDICT—*what does not preserve alleged excessiveness of, for review.* Where a written motion for a new trial is filed specifying the grounds upon which the defeated party relies, which does not contain any complaint as to the size of the verdict, the question of the alleged excessiveness of such verdict is not saved for review.

Action in case for personal injuries. Appeal from the Circuit Court of Will county; the Hon. F. L. HOOPER, Judge, presiding. Heard in this court at the October term, 1906. Affirmed. Opinion filed March 13, 1907.

JOHN H. GARNSEY, for appellant.

J. J. WELLNITZ and J. W. DOWNEY, for appellee.

MR. PRESIDING JUSTICE DIBELL delivered the opinion of the court.

George Cukravony, also called Shuler, was injured while working for the Chicago, Lake Shore & Eastern Railway Company, and brought this suit to recover damages for said injury, and had a verdict for $2,150 and judgment thereon with interest, from which judgment defendant prosecutes this appeal.

Appellant had in its yards at Joliet a certain place known as the ash dumps. There were three parallel tracks. On each of the outer tracks switch engines were brought in to clean their fires, and their ashes were left in a depression between the rails of these tracks. Ashes were taken from these engines from six to seven o'clock in the morning, from noon to one o'clock in the afternoon, from six to seven o'clock at night, and again at midnight. Upon the middle track flat cars were placed. It was appellee's duty to shovel the ashes into an iron wheel barrow and to convey them to the flat cars by wheeling the barrow up a long incline, erected by him, at the end of one of the flat cars on the middle track, said incline being composed of two planks placed end to end, the center of the incline being supported by blocks underneath, and the outer ends of the planks resting upon the car and the ground respectively. After the cars were loaded with ashes they were taken away. It was appellee's duty to go to work at seven o'clock in the morning, which was after the engines had been removed. He went to dinner during the noon hour, when engines were on the tracks and their fires were being cleaned out, and he finished his work there for the day and went elsewhere to work before engines came upon the tracks to clean the fires at night. He therefore was not accustomed to work while engines were upon the track. The engines which came upon these tracks were almost entirely switch engines of comparatively small size. When he

had been employed at this labor about six weeks a
large road engine came upon one of the outside tracks
about 10:30 A. M. and stopped so that the cow-catcher
was opposite the incline used by appellee to wheel
ashes upon the car. Two men got off the engine, and
appellee asked them how soon they were going to start
up. They said about noon, and told him there was no
danger and that he could work. They then left the en-
gine and went away, and another man, whom appellee
had seen repairing engines, remained upon the engine.
Appellee loaded four wheelbarrows full of ashes in
front of this engine, and wheeled them up the incline
upon the car and dumped them, and put a fifth load
upon the wheelbarrow, and was near the top of the in-
cline with it when the man on the engine moved it
slightly forward, and while doing so opened the cylin-
der cocks and emitted a large quantity of steam and
hot water against the place where appellee was wheel-
ing the load up the incline. Appellee was enveloped
in steam so that he could not see the plank before him,
and claimed also to have been saturated by the hot
water. He became confused and failed to guide his
barrow properly, and, perhaps, ran it against the brake
rod on that end of the flat car. He fell or was thrown
or jumped off from the plank to the ground, and the
iron barrow fell upon him, and he was thereby in-
jured. He went home a few hours later, was visited
by his foreman the next day, was then called to the
office and was examined by the company's physician
and surgeon, who found a rupture which he described
as "an indirect inguinal hernia." At the suggestion
of this surgeon appellee went to a hospital, where two
of appellant's surgeons placed him under anæsthetics,
opened the abdomen, restored the protruding intes-
tine to its place and sewed together the tissues between
which the rupture had been made. He remained in the
hospital several weeks, and afterwards entered the
employ of the city of Joliet at labor upon the streets.

Afterwards hernia again developed at or very near the same place. There was proof tending to show that appellee was injured and ruptured about three weeks before this accident, but did not suffer much therefrom until this accident; and other evidence that he had no rupture until this accident. There was a difference of opinion in the medical testimony as to whether the second rupture was or was not the breaking out anew of the old rupture.

It is contended that the relation of fellow-servants existed between appellee and the man who moved the engine and discharged the steam from the cylinder cocks. Appellee did not know and had never talked or worked with the men who brought the engine in or with the man who moved it. He had seen the man who moved the engine working around engines in the yard. He was not accustomed to the presence of engines on these tracks while he was working there. The question whether the relation of fellow-servants existed was submitted to the jury under proper instructions. We have no doubt that under this state of facts the question whether the relation of fellow-servants existed was for the jury to determine. C. & A. R. R. Co. v. O'Brien, 155 Ill. 630; National Enameling Co. v. McCorkle, 219 Ill. 557; Ill. Steel Co. v. Ziemkowski, 220 Ill. 324.

It is argued that appellee assumed the risk of this accident. We are of opinion that under the facts stated it was a question of fact, and that under the evidence the jury could reasonably find that this risk was not assumed.

In the office of the company, on the day when the surgeon examined him and advised him to go to the hospital, and before he went to the hospital, appellant's agent paid appellee $50 by a check, and appellee signed a release and discharge of this cause of action, and appellant relies upon it to defeat this suit. Appellee is a Slav, and did not read or write the English language, and spoke broken English. He testified

that appellant's agent said nothing about a release, but told him to go and get the money to keep his family before he went to the hospital, and then to come back and let him settle the case; that the agent told him to sign papers which were presented to him and that he did so, but did not know he was signing a release of his cause of action.  The numerical preponderance of the evidence is that the release was read to appellee before he signed it, and that he was not told that appellant would settle with him after he came out of the hospital.  He had no friend present, and did not know then how serious the operation would prove to be, and it is a question whether he would have been likely under those circumstances to knowingly release his cause of action for that sum.  The question whether he was bound by this release, under numerous decisions which we need not cite here, was left to the jury under instructions of which no complaint is made in the argument here.  The jury and the trial judge had a better opportunity than we have to see what degree of intelligence appellee possessed and what knowledge of the English language he had.  If the jury had found the release binding upon appellee and the trial judge had approved that finding, we could not have disturbed it upon this evidence; but although appellant outnumbered appellee in witnesses upon this subject, yet we conclude that the state of the proof is such that we ought not to disturb the verdict on that subject which the trial judge has approved.

Appellant argues that the damages are excessive.  Appellant filed a written motion for a new trial, specifying in detail the grounds upon which it relied.  It did not therein claim that the damages were excessive.  It did therein state that the verdict was against the evidence, but we do not consider that that presented for the determination of the trial court the question whether the damages were excessive.  Where such a written motion for a new trial is filed specifying the grounds upon which the defeated party relies, he

thereby waives his right to raise any other questions growing out of the trial and the verdict. W. Chi. St. Ry. Co. v. Krueger, 168 Ill. 586; Odin Coal Co. v. Tadlock, 216 Ill. 624. If appellant had made this point in its motion for a new trial it may be that the trial court would have required, and that appellee would have submitted to, a *remittitur*. As appellant did not present this supposed error to the court below in its motion for a new trial, it cannot be heard upon that question here.

Appellant does not argue that the court erred in rulings upon the instructions. We find no reversible error in the record.

The judgment is, therefore, affirmed.

*Affirmed.*